UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
VIRGINIA LALLAVE,

                              Petitioner,          **MEMORANDUM & ORDER**
        -against-                                  **22-CV-791 (NGG) (RLM)**

F. MARTINEZ, JR., PATRICK MCFARLAND,
AND MICHAEL CARVAJAL,

                              Respondents.
_____

NICHOLAS G. GARAUFIS, United States District Judge.

Petitioner Virginia Lallave petitions for a writ of habeas corpus under 28 U.S.C. § 2241, awarding declaratory and injunctive relief because the conditions of her confinement violate the Constitution and laws of the United States. For the reasons stated below, the Petition is DENIED.

## I.   BACKGROUND

On August 7, 2018, Petitioner was arrested on a complaint charging serious bodily injury resulting from narcotics distribution and conspiracy. (*See* Compl., *United States v. Lallave*, No. 19-CR-15 (AJN) (S.D.N.Y. Aug. 7, 2018) ("*Lallave I*") (Dkt. 1).) Several months later, in January 2019, an indictment was returned, charging Petitioner with additional counts of narcotics distribution and conspiracy. (*See* Indictment, *Lallave I*, No. 19-CR-15 (AJN) (S.D.N.Y. Jan. 7, 2019) (Dkt. 14).) On July 3, 2019, Petitioner pled guilty to participating in a conspiracy to distribute substances containing a detectable amount of fentanyl and participating in a conspiracy to distribute and possess with intent to distribute substances containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846. (*See* Plea Tr. at 10:1-14, *Lallave I*, No. 19-CR-15 (AJN) (S.D.N.Y. July 3, 2019) (Dkt. 26); Judgment, *Lallave I*, No. 19-CR-15 (AJN) (S.D.N.Y. Nov. 14, 2019) (Dkt. 37).) Petitioner was sentenced to 42

months' imprisonment and three years of supervised release. (*See* Sentencing Tr. at 27:17-20, *Lallave I*, No. 19-CR-15 (AJN) (S.D.N.Y. Oct. 4, 2019) (Dkt. 41).)

On July 2, 2020, pursuant to the expanded authority of the Bureau of Prisons ("BOP") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Petitioner was released from FCI Danbury and placed in the custody of the Bronx Community Reentry Center ("Reentry Center"). (Pet. (Dkt. 1) ¶¶ 12, 14; Mem. in Opp. ("Opp.") (Dkt. 14) at 5.) Since her release, Petitioner has been a home health aide for her father, who is on dialysis; the primary caretaker for her two children, a one-year old and ten-year old; employed doing maintenance; and has completed three courses. (Pet. ¶ 16.) The Reentry Center has supervised Petitioner and regularly tested her for controlled substance use. (*Id.* ¶¶ 19-20.) Prior to February 1, 2022, she had not faced any allegations of controlled substance use nor received any incident reports for other alleged violations of BOP rules. (*Id.* ¶ 20.)[1]

On February 1, 2022, Petitioner was directed to report to the Reentry Center with a change of clothes. (*Id.* ¶ 21.) Upon her arrival, she was presented with an incident report, which indicated that her January 22, 2022 urine sample was positive for marijuana. (*See* Incident Report (Dkt. 15-2).) The report charged her with violating Code 112 of the BOP's Inmate Discipline Program. (*Id.*)

On February 2, 2022, a BOP investigator, J. Ortiz, met with Petitioner. Though the investigator advised Petitioner of her right to remain silent, she stated that she had stayed out of trouble for the past twelve months, described her various familial and employment obligations, and stated that she wanted to get into

---

[1] Incident reports are reports produced by the BOP when someone in its custody is alleged to have violated its rules. (*Id.*)

a program for her remaining sentence. (Investigation Record (Dkt. 15-6).) In addition to his conversation with Petitioner, Ortiz reviewed the incident report, the Reentry Center community agreement signed by Petitioner, the orientation checklist, the chain of custody form for the urine sample, and the results from the laboratory. (*Id.*) Based on the evidence, Ortiz concluded that there had been a violation and referred the case to the Center Discipline Committee ("Discipline Committee") for a hearing. (*Id.*)

The same day, Petitioner was given a form titled "Notice of Center Discipline Committee Hearing." (Notice (Dkt. 15-7).) This form notified Petitioner that she was being referred to Discipline Committee based on her use of unprescribed narcotics. (*Id.*) The form provides that "[y]ou are entitled to have a staff member represent you at the hearing," and Petitioner initialed next to "I (do not) wish to have a staff representative." (*Id.*) The form further provided that she had the right to call witnesses and to present documentary evidence, but she signed that she would have no witnesses. (*Id.*) She also received a form titled "Inmate Rights at Center Discipline Committee Hearing," which notified her of (i) her right to have a written copy of the charges against her at least 24 hours prior to appearing, (ii) the right to have a member of the staff represent her, (iii) the right to call witnesses and present documentary evidence, (iv) the right to remain silent, (v) the right to be present except during deliberations, (vi) the right to be advised of the Discipline Committee's recommendation and the BOP's decision, as well as the facts supporting the recommendation and decision, and (vii) the right to contest the decision within 20 days. (*See* Inmate Rights Form (Dkt. 15-8).) Petitioner signed this form acknowledging that she had been notified of these rights on February 2, 2022. (*Id.*) In her Discipline Committee hearing, Petitioner again indicated that she had received a copy of the charges on February 1, 2022 and initialed

that she was advised of the rights described above and waived many of these rights. (Discipline Committee Report (Dkt. 15-9).)

The Discipline Committee, which was composed of only one individual, A. Toribio, found that Petitioner had violated the BOP program and recommended loss of good time credits. (*Id.*) The Discipline Committee Report was then forwarded to the Discipline Hearing Officer ("DHO"), N. Hayden, who determined that the Discipline Committee's findings were supported and imposed a sanction of 41 days of good conduct time. (*See* DHO Report (Dkt. 15-12).)

Also on February 2, 2022, Petitioner's counsel wrote to the Director of the Reentry Center, the BOP's Northeast Regional Counsel, and the BOP's Residential Reentry Manager requesting that Petitioner be returned to home confinement, that counsel be provided with the toxicology report, and that counsel be permitted to participate in procedures where sanctions such as revocation of home confinement were contemplated. (Pet. ¶ 22.) Petitioner asserts that this "letter constitutes a request for reasonable accommodations for her to meaningfully access BOP's home confinement program," as it "asked that the BOP take into consideration . . . that she suffers from multiple physical and mental disabilities including anxiety and severe migraines." (*Id.* ¶¶ 23-24.)

On February 3, 2022, Petitioner was given a copy of the Discipline Committee report signed by the DHO and instructions for administrative appeal. (Ltr. from P. McFarland (Dkt. 15-13).) She was informed that she would be confined to the Reentry Center for 30 days, but she was not given any documentation to that effect. (Pet. ¶ 33.)

From February 3, 2022 to February 8, 2022, Petitioner was confined to a room at the Reentry Center, which she was not permitted to leave. (*Id.* ¶ 32.) On February 8, 2022, U.S. Marshals picked up Petitioner at the Reentry Center and brought her to the

Metropolitan Detention Center ("MDC") in Brooklyn. (*Id.* ¶ 33.) She was not permitted to show proof of vaccination, which she had on her phone, and as a result, she was put in the Specialized Housing Unit, which was being used to quarantine unvaccinated new arrivals. (Reply (Dkt. 16) at 2 & n.2.)

On February 11, 2022, Petitioner filed the instant Petition, which asserted violations of procedural due process, substantive due process, the Eighth Amendment, the *Accardi* principle, the Rehabilitation Act, and a request for a Declaratory Judgment. (Pet. ¶¶ 42-68.) The Petition also included a request for enlargement, which the court granted because of the irreparable harm that incarceration would cause to Petitioner's family and employment, and Petitioner was released from the MDC on February 12, 2022. (*See id.* ¶¶ 69-72; Feb. 11, 2022 Order.) On February 21, 2022, Petitioner filed an administrative appeal with the BOP's Regional Office. (*See* Reg'l Admin. Remedy Appeal (Dkt. 15-1).)

On March 10, 2022, at 1:48am, Petitioner failed to respond to a required "check-in" request from the Reentry Center on her phone, which is part of the home confinement program. (Reply at 2-3.) Since Petitioner was sleeping, she failed to call back for two hours, though GPS showed that she was at her house. (*Id.* at 3.) She was again issued an incident report for violating a condition of the program. (Second Incident Report (Dkt. 16-2).) When she met with Reentry Center staff about this incident, her request to have counsel present was denied. (Reply at 3.) On March 16, 2022, Petitioner received a document from the BOP, which indicated that the DHO had found a violation and imposed sanctions of 14 days of loss of privileges. (June 7, 2022 Jt. Ltr. (Dkt. 26) at ECF pp. 1, 4.)[2] Subsequently, the BOP

---

[2] This means that Petitioner was not permitted to receive "passes" from the Reentry Center to leave her house for activities other than employment and medical appointments during this 14-day period.

expunged this incident from Petitioner's record and represented both to Petitioner and to this court that the "BOP will not rely on the March 11 incident report in determining anything related to Petitioner's status on home confinement." (*Id.* at ECF p. 2.)

## II.  LEGAL STANDARD

A federal prisoner may petition for habeas relief if she "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). A challenge under § 2241 is a challenge to the execution of a prisoner's sentence, as opposed to a challenge to the imposition or legality of a sentence under 28 U.S.C. § 2255. The Second Circuit has broadly interpreted the remedies available under § 2241 to include "the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions," *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001),[3] as well as disciplinary sanctions, such as the loss of good-time credits, *see Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001). The petitioner "bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011).

## III.  DISCUSSION

### A.  Venue

A petition filed under 28 U.S.C. § 2241 that challenges "present physical confinement" must be brought in the district of confinement. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004). The factors to consider in determining the appropriate venue for a

---

[3] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

habeas petition, often referred to as the *Braden* factors, are (1) "where all the material events took place"; (2) where "records and witnesses pertinent to the petitioner's claim are likely to be found"; and (3) the relative convenience of the forum for the parties. *Henderson v. Immigration & Naturalization Serv.*, 157 F.3d 106, 128 n.25 (2d Cir. 1998) (quoting *Braden v. 30th Judicial Circuit County of Ky.*, 410 U.S. 484, 493-94 (1973)).

Respondents contend that this action should be dismissed for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) or 28 U.S.C. § 1404(a) and transferred to the Southern District of New York. Though Respondents concede that jurisdiction was initially appropriate in the Eastern District since Petitioner was detained at the MDC, they argue that venue is now proper in the Southern District because Petitioner resides in the Bronx, she is supervised by the Bronx Reentry Center, and the incident occurred in the Bronx, so the most relevant records and witnesses are located in the Southern District. Additionally, Respondents note that Petitioner was sentenced in the Southern District.

Petitioner argues that venue is proper in this court because the Reentry Center field office that manages the BOP confinement program is in Brooklyn. Additionally, Respondent McFarland, the Regional Reentry Director, who is apparently a key actor in determining whether an alleged violation will result in revocation of home confinement, is based in this district. Petitioner also notes that her case was required to have been filed in the Eastern District since she was detained here. Finally, Petitioner asserts that her choice of forum is entitled to significant weight.[4]

---

[4] In support of this argument, she directs the court to a Second Circuit case, which held that courts should defer to plaintiff's choice of forum when ruling on a motion to dismiss on *forum non conveniens* grounds, *see Iragorri*

Turning to the first two *Braden* factors, the material events in this case occurred in both the Eastern and Southern Districts of New York, and as a result, the records and witnesses pertinent to the claim are likely to be found in both districts. The positive marijuana test and supervision occurred in the Southern District, but the confinement that was initially challenged, the Reentry Center field office that manages the program, and the person who apparently decides whether home confinement is revoked are all located in the Eastern District.

Though the first two factors prove equivocal in determining the appropriate venue, the third *Braden* factor, the relative convenience of the forum for the parties, counsels in favor of keeping this case in the Eastern District. Two of the respondents, F. Martinez Jr., the warden of the MDC, and Patrick McFarland, the Regional Reentry Director, have their primary places of business in this district. The final respondent, Michael Carvajal, the Director of the BOP, appears to be based in Washington D.C., so the Southern District is not meaningfully more convenient. Furthermore, Respondents are represented by an Assistant U.S. Attorney for the Eastern District of New York. And although Petitioner resides in the Bronx, she is supervised by the Reentry Center program, which is based in Brooklyn and appears unconcerned about the extra stop on the subway from downtown Manhattan to downtown Brooklyn. As a final consideration, the issues in this Petition have been fully briefed in this court, and as a result, "the predisposition in this Circuit to reach the merits of a dispute in service to judicial economy compel the assertion of jurisdiction by this Court." *Campbell v. Ganter*, 353 F. Supp. 2d 332, 338 (E.D.N.Y. 2004). Since "the Southern District would apply the

---

*v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001), but it is not clear to the court that this presumption applies in the context of § 2241.

same law to this case, the interests of judicial economy militate in favor of the resolution of [the] habeas petition before this court at this time." *Id.* Thus, the court declines to transfer this case to the Southern District and finds that venue is appropriate in the Eastern District of New York.

**B.   Mootness**

Federal courts have subject matter jurisdiction only where there is a live controversy and must dismiss a case when the issue between the parties becomes moot. However, there is no "categorical rule rendering *habeas corpus* petitions moot when the prisoner is released." *Farez-Espinoza v. Napolitano*, No. 08-CV-11060 (HB), 2009 WL 1118098, at *5 (S.D.N.Y. Apr. 27, 2009) (collecting cases). Even after an inmate is released, courts must consider whether "(1) secondary or 'collateral' injuries survive after resolution of the primary injury; (2) the issue is deemed a wrong capable of repetition yet evading review; (3) the defendant voluntarily ceases an allegedly illegal practice but is free to resume it at any time; or (4) it is a properly certified class action suit." *Id.*

The parties agree that the issue of the 41 days of lost good time credit remains live, as it is a secondary or collateral injury that survives the resolution of the primary injury of Petitioner's detention. But the parties disagree about whether the issue of Petitioner's detention remains live. Respondents contend that since Petitioner was released, and the BOP has agreed not to confine her based on the marijuana infraction, only the issue of the lost good time credit remains. Petitioner does not dispute that the BOP has agreed not to seek reimprisonment on this violation. (Oral Argument Tr. ("Tr.") at 10:22-11:2.) Yet Petitioner asserts that she "remains subject to BOP re-imprisoning her in violation

9

of her rights." (Reply at 5-6.)[5] Further, Petitioner contends that the BOP has not committed to providing the legal process that she is entitled to and allegedly regularly revokes home confinement in violation of due process.

### 1.   Capable of Repetition, Yet Evading Review

The capable of repetition, yet evading review, exception applies in exceptional circumstances. *See City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983). This exception applies where both "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990).

#### a.   Legal Framework

In the context of habeas petitions, the question of whether there is "a reasonable expectation that the same complaining party [will] be subjected to the same action again" is nuanced. Where an inmate is "able—and indeed required by law—to prevent such a possibility from occurring," courts have declined to find this exception to mootness applicable. *Spencer v. Kemna*, 523 U.S. 1, 13 (1998); *see also Leybinsky v. U.S. Immigration and Customs Enforcement*, 553 F. App'x 108, 109-10 (2d Cir. 2014) (summary order) (finding no reasonable expectation of future detainment where it would require presuming future violations of the terms of the inmate's release).

Where the possibility of revocation is beyond an inmate's control—for example, subject to the discretion of the detaining

---

[5] At the time of filing, Petitioner also argued that she "is currently facing potential re-imprisonment based on sleeping through check-in requests." (Reply at 5-6.) However, given that this incident report has been expunged, and the BOP has represented that this incident will not bear on the status of her home confinement, this is no longer a concern.

agency—courts have found that the exception is applicable in only very limited circumstances. In these scenarios, courts have focused on the likelihood that the inmate in question will be subject to the exact same action. *See, e.g., Jangmo v. Barr*, No. 20-CV-256 (JLS), 2020 WL 1891762, at *2 (W.D.N.Y. Apr. 16, 2020) (holding that that there was no reasonable expectation of being subject to the same action where the petitioner "ha[d] not indicated how *she specifically* is in foreseeable danger of arbitrary detention" (emphasis added)). Though "*absolute* certainty of injury is not required for a case to be constitutionally ripe," *Simmonds v. Immigration & Naturalization Serv.*, 326 F.3d 351, 358 (2d Cir. 2003), "the expectation that the dispute will recur must be reasonable, and not wholly speculative," *Pierre-Paul v. Sessions*, 293 F. Supp. 3d 489, 492-93 (S.D.N.Y. 2018) ("Petitioner can point to no facts indicating that under these circumstances ICE is likely to exercise its discretion to detain her again and re-start her removal."); *see also Ojo v. Wolf*, No. 20-CV-6296 (EAW), 2021 WL 795320, at *2 (W.D.N.Y. Mar. 2, 2021) ("[T]he existence of a chance of re-detention does not satisfy this exception."); *Doe v. Decker*, No. 18-CV-3573 (GBD) (KNF), 2019 WL 2513838, at *3 (S.D.N.Y. June 18, 2019) (finding that the exception did not apply where "Petitioner otherwise provided only 'conclusory allegations' of any future detention by Respondents"). Even where regulations allowed ICE to revoke release "in the exercise of discretion" and "in the opinion of the revoking official," the Second Circuit held that there was no reasonable expectation of being subject to the same action because the inmate had previously been subject to re-detention only for violating the terms of his release. *Leybinsky*, 553 F. App'x at 110.

It is only where respondents have "repeated[ly] emphasi[zed] . . . the statutory and regulatory regime" that would allow them to take petitioners into custody at any time and "assert[ed] both a broad power and the specific intention to take [petitioners] into custody" that courts have found a certain

enough likelihood of re-detention. *Basank v. Decker*, No. 20-CV-2518 (AT), 2020 WL 1953847, at \*4 (S.D.N.Y. Apr. 23, 2020) ("But for the Court's order restraining Respondents from rearresting Petitioners, Respondents would presumably seek to detain Petitioners anew."); *see also Tashbook v. Petrucci*, No. 20-CV-5318 (KMK) (PED), 2021 WL 8013812, \*2 (S.D.N.Y. Apr. 22, 2021) (holding that it was "reasonably likely that petitioner could again be quarantined . . . perhaps multiple times—without an opportunity to fully litigate . . . the BOP's quarantine policy" where an Assistant Warden told him that he "was still subject to an extended stay in the Quarantine Unit at any time and for any reason," and many inmates and staff members at the facility had COVID-19).

   *b. Application*

   Petitioner suggests that the possibility of revocation is, in certain circumstances, outside of her control. First, she points the court to four cases in other jurisdictions in which inmates have been re-detained for seemingly innocuous failures that were, though technically within their physical control, at the very least, imposed unreasonable or unfair expectations.[6] Second, Petitioner alleges that "[t]he BOP continues to take the position that

---

[6] Petitioner notes the following four cases:

- A Connecticut case in which the inmate allegedly "stop[ped] at an AT&T store to try to get her cell phone fixed—which she understood she had permission from RRC staff to do." (Reply at 5 n.5.) Petitioner neglected to mention that this was the inmate's third violation in less than two months: first she failed to answer for a check in on May 6, 2021, then she was at an unauthorized address for one hour and fifteen minutes on June 10, 2021, and then she was at the AT&T store on June 21, 2021, which she apparently mentioned to a facility member, but did not get approval for. (*See* Mot. to Dismiss at 3-4, *Tompkins v. Pullen*, 22-CV-339 (OAW) (Dkt. 14-1).) As a result of the "most recent documented behavior and repeated failure to comply

with [Reentry Center] rules and regulations," the inmate's home confinement was revoked. (*Id.* at 6.) That inmate remains incarcerated while her petition is pending, as the court denied enlargement since the inmate had not shown that "she has raised substantial claims and that extraordinary circumstances make enlargement necessary." *Tompkins v. Pullen,* No. 22-CV-339 (OAW), 2022 WL 871938, at *2 (D. Conn. Mar. 23, 2022).

- A Maryland case in which an inmate attended a computer class without written authorization, though she apparently believed that she had been authorized to attend. (*See* Mot. for Emergency Status Hr'g at 2-3, *United States v. Levi,* No. 04-CR-235 (DKC) (Dkt. 2082).) According to the BOP report, there was an alarm on the monitoring system indicating that the inmate had left her approved address. (Levi Incident Report (Dkt. 2082-1) at 4.) The BOP called her twice and buzzed her GPS monitor, but the inmate did not respond because she was in class. (*Id.*) The BOP report presents that the petitioner was unaccountable for over four hours, which is classified as an "escape," (*id.*), but the inmate alleges that the report is "flawed" and attempted to contact the supervising agency "immediately after class (before expiration of the four-hour period constituting an 'escape')," (Mot. for Emergency Status Hr'g at 3 n.2, *Levi,* No. 04-CR-235). The petitioner in this case was granted compassionate release from her sentence following this incident, so her habeas petition was denied as moot.

- In a California case, an inmate had his home confinement revoked after he told the supervising agency that he did not have reliable transportation to take him to cancer treatments and missed a treatment appointment because his wife couldn't take him. (Opp. to Mot. for Release at 7, *United States v. Morton,* No. 15-CR-611 (SVW) (Dkt. 378).) The BOP revoked his home confinement "[b]ecause of the delay caused by defendant in continuing regular treatment, and instability surrounding his consistent access to care." (*Id.*) The petitioner's motion for compassionate release under the First Step Act was granted, and he has since been released. (*See* Order, *Morton,* No. 15-CR-611 (SVW) (Dkt. 388).)

- In a Virginia case, which is most similar to Petitioner's March 10, 2022 incident, an inmate did not respond to check-in phone calls at 7:52pm. (*See* Petition at 3, *Martinovich v. Scales,* No. 21-CV-376 (RCY) (LRL) (Dkt. 1).) Like Petitioner, the inmate's ankle monitor

it can re-imprison those on home confinement, including Peti-
tioner absent a pre-imprisonment hearing with other procedural
protections." (Reply at 5-6.) In support of this contention, she
directs the court to the transcript from a proceeding in the Cen-
tral District of California in which counsel for the BOP stated that
the agency "has the authority to transfer the defendant from
home confinement back into custody . . . under its statutory pow-
ers for any reason." (*Id.* at 6 n.6.) But Respondents in this action
have not asserted a general authority to take an inmate back into
custody at any time for any reason or for no reason, nor have
they stated any specific intention to revoke Petitioner's home
confinement.

In nearly two years of serving on home confinement un-
der the rigid restrictions of the Reentry Center, including drug
testing and required phone check-ins at odd hours, Petitioner has
received only two disciplinary infractions. One of these infrac-
tions resulted in the revocation of her home confinement, which
was for the use of marijuana, a knowing and intentional violation
of the program that was entirely within Petitioner's control. *See*

---

indicated that he was at home. (*Id.*) At 11:22pm, police officers
came to his residence and knocked lightly on the door but did not
ring the doorbell or make any other noise. (*Id.* at 3-4.) The inmate
indicated later that he had been asleep in his second-floor bed-
room. (*Id.* at 4.) At 1:43am, he woke up and called the supervising
agency upon realizing that he had missed calls, and the vibrate
function on his ankle monitor had not been working properly. (*Id.*)
The BOP classified this incident as an "escape" and revoked home
confinement. (*Id.*) However, this incident report was later ex-
punged, he was returned to home confinement, and the parties
stipulated to the dismissal of the petition, which suggests that the
BOP subsequently determined that revocation was inappropriate
based on the later-developed facts. (*See* July 16, 2021 Emails, *Mar-
tinovich*, No. 21-CV-376 (RCY) (LRL) (Dkt. 5-1).) This is consistent
with the fact that the BOP did not revoke Petitioner's home con-
finement based on missing a check-in call because she was
sleeping.

*Leybinsky* at 110. The other infraction was for the missed check-in call and has since been expunged from her record. Even assuming that missing a check-in call is outside of Petitioner's control, she has not shown that there is a reasonable likelihood that she would be re-detained for this type of infraction. The BOP's choice to revoke home confinement in the four cases in other jurisdictions appear to be the exception, not the rule. According to a source provided by Petitioner, as of December 6, 2021, 4,879 inmates were placed on home confinement pursuant to the CARES Act.[7] As of November 5, 2021, 79 of the inmates were placed back in custody for "technical violations" and 49 for "escape."[8] This means that, at most, 2.6% of inmates granted home confinement under the CARES Act may have been placed back in custody for reasons outside of their control or due to BOP error. While the court takes no pleasure in the BOP's decision to revoke home confinement in these other cases, these instances of revocation, which represent only a small percentage of program—and some of which may have been for defensible reasons—do not create a reasonable expectation of future re-detention for Petitioner. The court cannot assume that the BOP will revoke Petitioner's home confinement based on factors outside of her control, in the absence of any evidence that it has previously done so or intends to do so.

---

[7] Ken Hyle, Assistant Director and General Counsel, Federal Bureau of Prisons, *Memorandum for Christopher Schroeder* (Dec. 10, 2021), https://www.aclu.org/memorandum-christopher-h-schroeder.

[8] The other categories of inmates who were returned to secure custody were for reasons entirely within the inmate's control: violation of program rules (alcohol use and drug use) and new criminal conduct. The court includes "escape" in its calculation to be overly conservative since the "escape" classification appears to have been applied in some cases either by mistake or where the inmate erroneously thought he or she had permission to be somewhere. *See supra* discussion at n.4.

Since Petitioner has not shown that there is a reasonable likelihood that she will be subjected to the same action again, the capable of repetition mootness exception is inapplicable.

   2.   Voluntary Cessation

"[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). To overcome the voluntary cessation exception, Respondents must show that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). This exception "aims to eliminate the incentive for a defendant to strategically alter its conduct in order to prevent or undo a ruling adverse to its interest." *E.I. Dupont De Nemours & Co. v. Invista B.V.*, 473 F.3d 44, 47 (2d Cir. 2006). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189. A party can satisfy this burden by "show[ing] that the possibility of recurrence is merely speculative." *Dark Storm Indus. LLC v. Hochul*, No. 20-CV-2725, 2021 WL 4538640, at *1 (2d Cir. Oct. 5, 2021) (summary order).

Petitioner directs the court to *Farez-Espinoza v. Napolitano* in support of her position that the voluntary cessation exception applies. 2009 WL 1118098, at *7. In *Farez-Espinoza*, the Government released the petitioner on bond, invoking its authority under 8 U.S.C. § 1226(a). The language of that statute provides that the Attorney General may revoke bond "at any time, without qualification, and may then re-detain the alien," and the Government had represented to the court "that it was unquestionably permitted to detain [petitioner] in any instance." *Id.* As a result,

16

the court found that the Government "failed to shoulder its formidable burden to demonstrate that it is absolutely clear that it would not have acted to redetain" the petitioner. *Id.*

As shown in *Farez-Espinoza,* and as required for the capable of repetition exception, courts have insisted upon some showing that the petitioner in question will be subject to detention for the alleged violation again in the future. *Compare Brea v. Mechkowski*, 156 F. Supp. 3d 423, 425 (S.D.N.Y. 2016) (distinguishing *Farez-Espinoza* because the Government had "not suggested that it can detain [petitioner] at will"), *with Abdi v. Duke*, 280 F. Supp. 3d 373, 396  (W.D.N.Y. 2017) ("[C]ounsel for Respondents confirmed that Respondents believe they can redetain [the petitioners] at a moment's notice for essentially any reason."), *order clarified sub nom. Abdi v. Nielsen*, 287 F. Supp. 3d 327 (W.D.N.Y. 2018). Additionally, the possibility of re-detention cannot be speculative. *See, e.g., Celestin v. Decker*, No. 17-CV-2419 (RA), 2019 WL 7946027, at *2 ("If [petitioner] is re-detained, he may bring a new habeas petition against the Government, as appropriate."); *Pierre-Paul*, 293 F. Supp. 3d at 293 ("The mere potentiality that Petitioner may be re-detained because she is under a removal order is insufficient to warrant this Court's retention of jurisdiction over the case.").

Here, Respondents have represented to Petitioner and to the court that they will not re-detain Petitioner for the positive marijuana test. Petitioner acknowledges as much, noting only that Respondents "have made no commitments whatsoever with respect to changing their procedures and their position with respect to home confinement revocation" and that "they've taken the position in other cases that BOP has unfettered discretion . . . that they're required to provide no process and that they can pull someone back into prison for any reason whatsoever, and this isn't limited to possible allegations of misconduct . . . , but also for programmatic reasons, health

reasons." (Tr. at 11:16-12:3.) But Respondents have not claimed to have the authority to revoke Petitioner's home confinement for any reason. Petitioner's arguments merely describe the BOP's actions and stated position in different cases involving different inmates.

"[W]here the Government submits a statement that the petitioner will not be re-detained, release may well render a *habeas* petition moot." *Farez-Espinoza*, 2009 WL 1118098, at *7. *But see Abdi*, 280 F. Supp. 3d at 397 (finding that the respondents' representation that they did not intend to re-detain petitioner "at this time . . . leaves open the possibility that Respondents could, on a whim, change course and decide to re-detain [petitioner]"). Here, the parties agree that Respondents will not re-detain Petitioner as it relates to the marijuana incident. Further, the court is not convinced that future revocation either in response to a new incident report or arising purely out of the BOP's discretion would fall under this exception. At this point, it seems that Respondents can only voluntarily cease their actions with respect to the marijuana incident, *i.e.*, they can stop attempting to detain Petitioner for this infraction. However, Respondents cannot now *ex ante* cease future attempts to detain Petitioner for infractions that have not yet occurred, *i.e.*, for some future incident or for purely discretionary reasons. In other words, if Petitioner's concerns came to fruition, Respondents would be seeking to detain her in a new case, unrelated to their now ceased actions in this case.

Though not a "necessary element" of this mootness exception, courts are often influenced by evidence that a party voluntarily halted its behavior "to avoid an unfavorable decision." *Farez-Espinosa*, 2009 WL 1118098, at *7; *see also Hubacek v. Holder*, No. 13-CV-1085 (JTC), 2014 WL 1096949, at *2 (W.D.N.Y. Mar. 19, 2014) (holding the exception inapplicable because "there is no indication that DHS released petitioner from

custody with the sole purpose of preventing judicial review of the legality of detention pending execution of the final order of removal"). Likewise, when a court or agency compelled the ceased behavior as opposed to defendants ceasing of their own volition, courts have found this exception inapplicable. *See Doe*, 2019 WL 2513838, at *3 ("Respondents did not 'voluntarily cease' Petitioner's detention. . . . Rather, they released Petitioner pursuant to a BIA decision."). Here, the court, not Respondents, ordered Petitioner released. Respondents have voluntarily ceased their behavior only insofar as they have agreed not to reimprison her (in violation of the court's order) for the marijuana infraction. There is no indication that this was a strategic decision to avoid judicial review, which, although not dispositive, warrants consideration.

Because Petitioner has been released from detention pursuant to the court's order, and Respondents have agreed not to reimprison her based on the marijuana incident, the requests for injunctive relief contained in the Petition related to her detention are moot. Since the demand for injunctive relief is moot, so too is Petitioner's request for declaratory relief. *See* 28 U.S.C. § 2201(a); *Choco v. Shanahan*, 308 F. Supp. 772, 773 (S.D.N.Y. 2018) ("[C]ourts may not entertain actions for declaratory judgment when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action."). As a result, only claims pertaining to the 41 days of lost good time credit remain live on this Petition. Thus, the court proceeds to consider Petitioner's claims that the 41 days of forfeited good time credit violated the *Accardi* principle and

the Rehabilitation Act, as well as her request for a declaratory judgment related to the good time credits.[9]

## C.  Administrative Exhaustion

Under 28 U.S.C. § 2241, prisoners must exhaust administrative remedies with the BOP prior to filing suit in federal court. *See Carmona*, 243 F.3d at 634. This requires compliance with the BOP's four-step Administrative Remedy Program. *See* 28 C.F.R. § 542.10(a). First, the inmate must attempt to informally resolve the issue with prison staff. *Id.* § 542.13. If this is unsuccessful, the second step is to file a Request for Administrative Remedy form with the prison warden. *Id.* § 542.15(a). If the request is denied or the Warden fails to respond within 20 days, the third step is to appeal to the BOP Regional Director. *Id.* §§ 542.15(a), 542.18. If the appeal is denied or the Regional Director fails to respond within 30 days, the prisoner may appeal to the BOP General Counsel. *Id.* Once the General Counsel denies the claim or fails

---

[9] The court need not rule on Petitioner's claims regarding procedural and substantive due process, as Petitioner is no longer "pressing the argument that the process leading to the forfeiture of her good time credits violated the due process clause." (May 2, 2022 Email from S. Russell to the court.) With respect to Petitioner's Eighth Amendment claim, she alleged that the decision to remand her to prison for "a single positive test for" marijuana "is an excessive and grossly disproportionate punishment" and "serves no legitimate penological purpose." (Pet. ¶¶ 51-52.) However, the court ruled that Petitioner's claims based on her home revocation are moot. Moreover, as Respondents correctly note, the Eighth Amendment is not the appropriate vehicle for challenging lost good time credits. Petitioner did not allege that the Eighth Amendment was violated when Respondents deducted 41 days of good time credit in the Petition, nor did she address the applicability of the Eighth Amendment in her Reply. Because Petitioner's Eighth Amendment claims related to revocation of her home confinement are moot, and she does not allege that the deduction of good time credits violates the Eighth Amendment, there is no longer a live Eighth Amendment claim.

to respond within 40 days, the claim is considered administratively exhausted. *Id.* § 542.18. The regulations allow for the BOP to request an extension "once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level," so long as the inmate is notified in writing. *Id.* At a maximum, the entire process may take up to 161 days or just over five months.

Section 2241's exhaustion requirement is "prudential, not statutory." *Snyder v. Angelini*, No. 07-CR-3073 (NGG), 2008 WL 4773142, at *2 (E.D.N.Y. Oct. 27, 2008). "Statutory exhaustion requirements are mandatory," but "common law (or 'judicial') exhaustion doctrine . . . recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process." *Perez v. Zenk,* No. 04-CV-5069 (CBA), 2005 WL 990696, at *2 (E.D.N.Y. Apr. 11, 2005). Thus, even where a prisoner fails to exhaust, he or she may be excused if she can meet the cause and prejudice standard, specifically by showing that there are "legitimate circumstances beyond the prisoner's control which preclude him [or her] from fully pursuing his administrative remedies." *Carmona*, 243 F.3d at 634. A court may excuse the failure to exhaust where "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003).

Respondents allege that Petitioner failed to comply with the BOP's four-step Administrative Remedy Program before filing suit, which precludes her ability to seek relief under 28 U.S.C. § 2241. Petitioner does not dispute that she failed to exhaust administrative remedies. Rather, she contends that requiring

exhaustion would be both futile and cause irreparable injury.[10] The court considers these two exceptions in turn.

1. Futility

Petitioner contends that exhaustion would be futile since she cannot be imprisoned in the absence of certain procedural protections, and the BOP's position is that it owes only more modest procedural protections. As an example, she notes her claim that representation by counsel is required prior to the revocation of home confinement, but that she was again denied counsel in connection with her second disciplinary proceeding for the missed check-in call. As a result, she insists that it would be futile to raise these claims with the BOP since they will be denied based on the BOP's position on what process is owed.

There is a high threshold for a finding of futility. *See Beharry*, 329 F.3d at 62 ("That [the petitioner's] argument would likely have failed . . . is not tantamount to stating that it would have been futile to raise it."). It is not sufficient that an agency has previously rejected a certain claim. *See, e.g., Ramraj v. Barr*, No. 19-CV-6723 (MAT), 2020 WL 470615, at *4 (W.D.N.Y. Jan. 29, 2020) ("[E]ven if Ramraj believes that his arguments on administrative appeal are unlikely to persuade the BIA to reverse the IJ's custody determination, that is not enough to establish futility."); *Paz Nativi v. Shanahan*, No. 16-CV-8496 (JPO), 2017 WL 281751, at *2 (S.D.N.Y. Jan. 23, 2017) (finding that previous unfavorable "decisions do not show that administrative appeal

---

[10] Petitioner claims that exhaustion is excused for "undue prejudice," which the court construes as most similar to the "irreparable harm" exception. (*See* Reply at 14.) This is consistent with the case that Petitioner cites in support of this argument, which is not in the habeas context, in which the Second Circuit noted that "threatened or impending *irreparable injury* flowing from delay incident to following the prescribed administrative procedure militates in favor of waiving exhaustion" in its explanation of the undue prejudice exception. *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019) (emphasis added).

would be futile as to [petitioner] himself (as the BIA could modify his bond determination) or as to [his] underlying claim more generally (as the BIA could consider the ability-to-pay issue more broadly)"); *Ayinde v. Ashcroft*, No. 03-CV-358 (GWG), 2003 WL 22087473, at *6 (S.D.N.Y. Sept. 10, 2003) ("That [petitioner's] claims may have proved unsuccessful is not tantamount to stating that appeal would have been futile."). Courts have declined to find futility even where unfavorable precedent was in place because it was theoretically possible that the precedent would be overruled. *See, e.g., Grullon v. Mukasey*, 509 F.3d 107, 113 (2d Cir. 2007) (finding no futility where "[t]he BIA could have reconsidered the *Perez* holding *in banc,* or it could have certified the question to the Attorney General"); *Theodoropoulos v. Immigration & Naturalization Serv.*, 358 F.3d 162, 173 (2d Cir. 2004) (finding the exceptions inapplicable because "[t]he BIA could have overruled" the Immigration Judge's decision). Courts have even required a "factual impossibility of relief," *Grullon*, 509 F.3d at 113, or a complete lack of authority to act on the claim, *see Beharry*, 329 F.3d at 59 (holding that "his claim . . . is still a claim that the IJ and the BIA have *authority to consider*" (emphasis in original)). *But see Pinto v. Menifee*, No. 04-CV-5839 (MHD), 2004 WL 3019760, at *3 (S.D.N.Y. Dec. 29, 2004) (finding that exhaustion "would be useless, since the BOP policy is the result of a directive from the Department of Justice that the BOP is powerless to change").

Here, Petitioner claims it would be futile to raise these claims with the BOP since they will be denied based on the BOP's position. However, the BOP's General Counsel, the final step in administrative exhaustion, presumably has the authority to change agency policy or at the very least reconsider Petitioner's claims about the lost 41 days of good time credit. Thus, Petitioner fails to meet the high bar for futility.

2.  Irreparable Harm

The "irreparable harm" standard has a similarly high bar. Courts have frequently found that even continued detention does not constitute irreparable harm. *See Torres v. Decker*, No. 18-CV-10026 (VEC), 2018 WL 6649609, at *3 (S.D.N.Y. Dec. 19, 2018) (finding that prolonged detention is not an irreparable injury that excuses exhaustion); *Giwah v. McElroy*, No. 97-CV-2524, 1997 WL 782078, at *4 (S.D.N.Y. Dec. 19, 1997) ("If incarceration alone were the irreparable injury complained of, then the exception would swallow the rule that the INS administrative remedies must be exhausted."). Rather, courts find irreparable harm only in exceptional circumstances, such as where a defendant is being held in solitary confinement. *See, e.g., United States v. Basciano*, 369 F. Supp. 2d 344, 349 (E.D.N.Y. 2005) (finding irreparable harm where defendant was being held in solitary confinement and "faced with the prospect of perpetual detention without access to judicial review under circumstances that raise a serious and urgent constitutional question while the BOP fiddles"); *Brooks v. Terrell*, No. 10-CV-4009 (AKT), 2010 WL 9462575, at *5 (E.D.N.Y. Oct. 14, 2010) (holding that detention in solitary confinement could constitute irreparable harm).

Petitioner alleges that exhaustion would prejudice her since it might delay relief until after her release. Petitioner got as far as submitting an administrative appeal with the Regional Office on February 21, 2022. (*See* Reg'l Admin. Remedy Appeal.) Thus, as of March 23, 2022, she would have been eligible to file an appeal to the General Counsel, assuming she had not yet heard back, and as of May 2, 2022, she was permitted to consider her claim denied and refile her petition in this court. Even if extensions were requested at both remaining levels of review, her claim would have been ripe for the district court by June 21, 2022 at the latest. Since Petitioner will not be released until December 2022, at the earliest, assuming that she is able to get back her good time credits, relief would not be delayed until after her

release. Furthermore, Petitioner is serving her sentence in home confinement, not in a prison facility. *Cf. Pimentel v. Gonzalez*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005). Thus, Petitioner has not shown that there is cause and prejudice to excuse exhaustion on the basis that she will suffer irreparable harm.

Because Petitioner has not shown that these exceptions to administrative exhaustion are applicable, the court does not have jurisdiction to hear her claims related to the 41 days of lost good time credit.

### D. Viability of New First Step Act Credits Claim

Petitioner raised a new claim in her Reply, arguing that the court should order that the BOP adjudicate the First Step Act ("FSA") time credits that Petitioner is entitled to. If she receives these credits, she contends that her release would occur in the near future, if not immediately, which would render the instant case moot. Respondents argue that Petitioner (1) cannot amend the Petition by raising arguments for the first time in her Reply brief; (2) has not filed an administrative claim for her FSA credit argument, so she has not exhausted her administrative remedies; and (3) is not entitled to FSA credits based on the crime she pled guilty to and the fact that the distributed substances caused serious bodily injury to three individuals. In response, Petitioner maintains that "it is quite possible that her sentence, that is her BOP sentence, could be done now" or "could have been done at the time she faced disciplinary proceedings . . . in February of '22." (Tr. at 18:24-19:8.) Consequently, "the BOP may not even have had the authority to engage or proceed with disciplinary proceedings against her." (*Id.* at 19:6-8.)

Respondents are correct that courts typically do not allow new arguments to be made in a reply brief, and this rule applies in the context of habeas petitions. *See Roberts v. United States*, No. 13-CV-653 (DLI), 2018 WL 1582288, at *2 (E.D.N.Y. Mar. 30, 2018) (declining to consider claims raised for the first

time in reply to habeas petition); *Melo v. United States,* 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) (same). The court agrees with Petitioner, however, that if her FSA credits would entitle her to immediate release or she may have been entitled to release as of February 2022, then it may be appropriate to consider the FSA claim at this time.

Similarly, if Petitioner is correct, exhaustion for this claim could be excused on the basis of irreparable harm. *See Pimentel*, 367 F. Supp. 2d at 371 ("Were Pimentel required to pursue administrative remedies prior to bringing this action, he would likely be done serving much, if not all of his entire sentence such that his request would become moot."); *Rubinov v. Pliler*, No. 21-cv-4397 (LJL), 2021 WL 5567826 (S.D.N.Y. Nov. 29, 2021) (finding § 2241 petition ripe for review where "[i]f Petitioner is correct on the merits of his claim and the BOP should have applied the FSA time credits he claims he has earned, Petitioner is currently being imprisoned when in fact he should not be"). However, not all courts in this circuit have taken this approach to exhaustion. *See Rosenberg v. Pliler*, No. 21-CV-5321 (VEC), 2021 WL 6014938, at *4 (S.D.N.Y. Dec. 20, 2021) ("Rosenberg's claim that he is entitled to immediate release alone does not excuse him from exhausting his administrative remedies."); *Cohen v. United States*, No. 20-CV-10833 (JGK), 2021 WL 1549917 (S.D.N.Y. Apr. 20, 2021) ("[T]o the extent that [petitioner] argues that potential [earned time credits] will be useless to him after he has completed his term of home confinement, he ignores the fact that [earned time credits] can be applied toward [his] time on supervised release."); *see also Masselli v. U.S. Parole Comm'n*, 631 F. Supp. 1442, 1446 (S.D.N.Y. 1986) ("Federal prisoners who challenge revocations of parole must exhaust administrative remedies before seeking habeas corpus relief, even though they claim they are entitled to immediate release."). This

is especially true where, as here, the petitioner "failed to complete *any* step of the BOP's four-step administrative review process." *Rosenberg*, 2021 WL 6014938, at *3.

However, the court need not quibble with whether Petitioner may raise new arguments in her Reply or whether exhaustion is excused since it seems that Petitioner would not be released immediately based on FSA credits. The FSA has a phase-in period for earned time credits ("ETCs"). Up until January 15, 2022, the BOP had exclusive discretion to grant FSA credits. As a result, courts in this circuit have consistently found that "the BOP is not required to award incentives until the end of the phase-in period," and "[u]ntil then, the Court lacks any basis to conclude that . . . petitioner has any right to time credits that the court can enforce." *DiStefano v. Pliler*, No. 21-CV-773 (AKH), 2021 WL 3524130, at *2 (S.D.N.Y. July 5, 2021); *see also Cohen*, 2021 WL 1549917, at *2-3 ("[T]he statute does not require the BOP to begin awarding ETCs during the phase-in period. . . . Accordingly, there is no basis for the Court to conclude that the failure of the BOP to provide [earned time credits] during the phase-in period is a violation of the First Step Act."); *Rubinov*, 2021 WL 5567826, at *7 ("Because the Court cannot require the BOP to exercise its discretion to calculate and apply Mr. Rubinov's time credits before January 15, 2022, Mr. Rubinov's petition must be denied and dismissed without prejudice at this time."). If the BOP is required to implement the FSA credit system—and the court can only enforce the system—as of January 15, 2022, less than a month before the Petition was filed, Petitioner could not possibly have earned enough ETCs to have been released almost a year early. As of the end of June 2022, approximately five and a half months will have passed since the January 15, 2022 deadline. Thus, at a maximum, Petitioner could have earned just over 80 days of good time credit. Even if Petitioner were to get back the 41 days of good time credit in the administrative process and have amassed the maximum FSA credits since

January 15, 2022, her release date would still be at the end of September or early October of 2022, which is not imminent.

Furthermore, the BOP is permitted to apply time credits only once an inmate "has earned time credits that equal the remainder of [her] sentence." 18 U.S.C. § 3624(g)(1)(A); *Milchin v. Warden*, No. 22-CV-195 (KAD), 2022 WL 1658836, at *3 (D. Conn. May 25, 2022) ("Until Milchin accumulates sufficient time credits to equal the remainder of his sentence, he is not eligible to have those credits applied."). This is because time credits may be lost. *See id.* Thus, since Petitioner's FSA credits do not equal the remainder of her sentence, it would be inappropriate for the court to direct the BOP to adjudicate the credits at this time.

Finally, it would be helpful to develop the factual record through administrative exhaustion. *See Cohen*, 2021 WL 1549917, at *4 (finding that the calculation of FSA credits "would benefit from further development of the record in the administrative process"); *Rosenberg*, 2021 WL 6014938, at *3 (same). This is especially true where "[petitioner] and the Government disagree about [her] eligibility for . . . any potential time credits under the FSA." *Cohen*, 2021 WL 1549917, at *4. Specifically, for example, determining whether Petitioner was assigned the "evidence-based recidivism reduction programs" described in 18 U.S.C. § 3621(h)(1)-(2). *See Milchin*, 2022 WL 1658836, at *3 (explaining that "a prisoner may earn time credits only for completing programs to which he has been specifically assigned based on his particular recidivism risk," but petitioner "has not yet been assigned to any programs and is not yet eligible to earn time credits under the FSA"). The court has virtually no information about what programs were assigned to Petitioner and to what extent she participated in these programs. Petitioner has asserted only that she has participated in relevant programming both at FCI Danbury and while on home confinement, which included GED and typing classes, working in the kitchen, and

training courses. (Reply at 3 n.4; Petitioner's Aff. (Dkt. 16-1) ¶ 20.) However, Petitioner has not specifically "identified any credits for which [s]he is eligible under the FSA that have not been awarded." *Milchin*, 2022 WL 1658836, at *3.

Because it does not seem possible that Petitioner is enti-tled to immediate release based on her earned FSA credits, and the record would benefit from development through administra-tive exhaustion, the court declines to consider Petitioner's new argument about FSA credits raised in her Reply.

## IV. CONCLUSION

For the reasons explained above, Petition is DENIED.

SO ORDERED.


Dated:     Brooklyn, New York
           June 2̱8̱, 2022


                                        s/Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge